1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,    :    22-CR-00486 (NRM)
                             :
     -against-               :    United States Courthouse
                             :    Brooklyn, New York
                             :
DWAYNE PICKETT,              :
                             :    May 7, 2025
              Defendant.     :    11:00 a.m.
                             :
                             :
                             :
- - - - - - - - - - - - - - - X
     TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
        BEFORE THE HONORABLE NINA MORRISON
           UNITED STATES DISTRICT JUDGE


              A P P E A R A N C E S:

For the Government:       BREON PEACE, ESQ.
                          United States Attorney
                          Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

                          BY:  KAMIL AMMARI, ESQ.
                               Assistant United States Attorney

For the Defendant:        FEDERAL DEFENDERS OF NEW YORK, INC.
                              One Pierrepont Plaza
                              Brooklyn, New York 11201

                          BY:  KYLA WELLS, ESQ.




Court Reporter:           JAMIE ANN STANTON, RMR, CRR, RPR
                          225 Cadman Plaza East
                          Brooklyn, New York 11201
                          Telephone: (718) 613-2274
                          E-mail: JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

(In open court.)

THE COURTROOM DEPUTY:  Criminal cause for a sentencing for case number 22-CR-00486, USA v. Pickett.

Counsel, please state your appearance for the record starting with the Government.

MR. AMMARI:  Good morning, Your Honor.  Kamil Ammari for the United States.

MS. WELLS:  Federal Defenders by Kyla Wells on behalf of Mr. Pickett who is present.

THE COURT:  Good morning.

Good morning, Mr. Pickett.  Glad to see you in person.  It's been some time.  Very glad you are here with us today.

We are here for sentencing in this matter.  So Mr. Pickett, let me start as I always do by explaining to you how we're going to proceed, and also to your family, who I know are present on Zoom.

So the first thing I am going to do is put on the record everything that I have received and considered with respect to sentencing.  I want to make sure that I have everything the parties have submitted to me and that the parties have received everything that I have reviewed so we are all working with the same information.  The only exception is the Probation Department's confidential recommendation as to sentencing which is my general practice

to keep confidential.

I'm sorry, can I get Probation's appearance?  I have been so focused.  I wanted to greet Mr. Pickett.  My apologies, I just looked over at you and realized I hadn't.  Go ahead.

THE PROBATION OFFICER:  Nicole Gervase with Probation.

THE COURT:  Thank you, Nicole.  Good to see you.

Next I am going to determine what the guideline range is under the advisory sentencing guideline system.

Mr. Pickett, as we talked about at your plea hearing and as I'm sure Ms. Wells has explained to you, the guidelines are strictly advisory, but I do have to consider them and calculate them and consider any upward or downward departures or variances that may be applicable in any case.

Then I consider what's called the Section 3553(a) factors to determine the appropriate sentence, whether a sentence in or outside the guidelines range is appropriate and what the sentence should be.

I will have some questions for the lawyers and then, Mr. Pickett, of course, the law gives you the right to make a statement to the Court before I impose your sentence.  You are under no obligation to say anything here today, but if you wish to make a statement, I'll, of course, give you that chance --

THE DEFENDANT:  Yes.

THE COURT:  -- and listen very closely to whatever you have to say.

And if there is anyone else on your behalf who wishes to make a statement, I did read all of the letters submitted at the time of your first scheduled sentencing and all the supplemental submissions, but if your lawyer or anyone else wishes to speak, I will allow them to do so as well.  And it's not until all that has happened that I will actually impose sentence.

Do you have any questions about the process?

THE DEFENDANT:  No, Your Honor.

THE COURT:  So we will discuss your treatment and your health at greater length today, but let me just ask you:  Are you in a physical and mental condition that will allow you to proceed with sentencing today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you wish to adjourn this sentencing for any reason?

THE DEFENDANT:  No, Your Honor.

THE COURT:  I am not going to ask you a lot right now, but let me have you pull that other mic a little closer, see if that one is on, to make sure I can hear you.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  There we go.

I know you are presently confined to a wheelchair, but if you need breaks to use the restroom or to shift position or it's time for medication, please let me know. At any time I really want you to be comfortable and present and especially in a case with this much history, sometimes the hearing can take a while.

So as the parties are all aware, sentencing in this matter was originally scheduled for August 14th of 2024. It was adjourned after Mr. Pickett was taken from MDC to the hospital because of severe pain in his leg and to obtain an urgent biopsy of what appeared to be a mass in his leg. That mass turned out to be a malignant tumor due to a rare form of cancer in Mr. Pickett's leg, officially diagnosed as an osteosarcoma. We had several status hearings last year while counsel was endeavoring to retrieve records and a treatment plan was developed in August and September. That plan ultimately included surgery to remove the tumor from the bone in Mr. Pickett's leg which, per the records I have received, required replacing his femur with a medical prosthesis as well as several courses of chemotherapy to treat the cancer before and after surgery.

That treatment is near the final stages, but does remain ongoing and I was informed by letter and scheduling conferences with the parties that Mr. Pickett is now in remission and that he wishes to proceed with sentencing

*Proceedings*                                                                6

without further delay.

Ms. Wells, before we proceed, let me just get from you an update on the remaining course of chemotherapy and other medical treatment.

MS. WELLS:  So Mr. Pickett has completed his courses of chemotherapy and fortunately his cancer is in remission, so going forward he is going to be required to undergo scans every three months to check for a new recurrence of cancer.  He also has to undergo, I believe, daily physical therapy to regain use of his leg.

I spoke with his doctor who has provided him with recommendations of where he can go moving forward in terms of obtaining that treatment.

THE COURT:  I thought I had received a communication earlier this week that there may be one remaining round of chemo still to go.  Can you tell me how that reconciles with what you just described?

MS. WELLS:  Sure.

So there was one more round.  There was three days of chemo that had been recommended by his doctor, by his oncologist.  Chemotherapy has been very, very difficult for Mr. Pickett and has caused very severe side effects for Mr. Pickett.  As of now, he is cancer-free.  His cancer is totally in remission.  And because of the severe way in which his body has reacted to chemotherapy, Mr. Pickett has

opted to not undergo those last three days of chemotherapy.

THE COURT:  Okay.

I know that in your submissions to me, you are now asking the Court to consider a sentence of time served.

Have you discussed with Mr. Pickett's providers whether that poses any risk at all to his health and safety if I were to grant it?  That is, any concern about disrupting his care, whether he'll be able to receive adequate care if he returns to North Carolina as you've proposed?

MS. WELLS:  I have discussed that with his oncologist and he actually sent me recommendations of where he can receive similar treatment in North Carolina, so it's not a problem.

THE COURT:  All right.

So let me now review some of the procedural history in this matter as I do in every case.

Mr. Pickett pled guilty in a hearing before me on March 7, 2024 to the three counts of the indictment that charged him with firearms trafficking in violation of 18 U.S.C. Section 922(a)(1)(A) and two counts of being a felon in possession of firearms in violation of 18 U.S.C. Section 922(g)(1).

I will now list the documents I've received. First, the Presentence Report that was originally filed on

*Proceedings*                                                        8

June 11, 2024.  Probation's confidential sentencing recommendation filed also on June 11, 2024.  The defense's original sentencing submission dated July 24, 2024, and filed on July 25th, which contained a letter brief from defense counsel, five letters from Mr. Pickett's family and friends, a reentry plan, and an opinion by Judge Furman in the *Chavez* case discussing certain medical and safety issues at the jail at the time it was issued.  As well as a memorandum from the president of the union representing MDC's correctional officers that discussed staffing levels and concerns about adequate staffing at MDC as of June 2023. I also received the Government's original sentencing submission dated July 31, 2024.  Then an addendum to the Presentence Report filed August 7, 2024.

Thereafter, after the medical issues we've previously discussed arose and we adjourned sentencing, I received a defense supplemental sentencing submission, dated April 23, 2025, filed on the 24th.  That submission attached certain exhibits related to Mr. Pickett's sick call requests and interactions with MDC which I believe were already part of the record, but defense wanted to highlight for my consideration.  It also contained a letter dated April 3, 2025, from Dr. Ilya Iofin, Chief of the Orthopaedic Oncology Service at Mount Sinai Medical Center.  It summarized Mr. Pickett's chemotherapy and medical treatments as well as

his medical prognosis and medical needs going forward.  It also contained a summary of Mr. Pickett's treatment and certain postsurgical complications written by Dr. Bobby Liaw, L-I-A-W, one of his treating oncologists at Mount Sinai, dated April 21, 2025.

I then received the Government's supplemental sentencing memorandum, ECF number 57, dated April 3, 2025. And I have also reviewed a report to the Court on defendant's medical issues by an expert that I appointed for that purpose, Dr. Homer Venters, V-E-N-T-E-R-S, which the defense consented to have publicly filed at ECF number 55. He was appointed as an independent medical expert on a pro bono basis dated April 10, 2025.  As I told the parties separately when I provided the report to them, the records that he reviewed are listed in the report and other than to retain him, I didn't communicate with him about the substance of the report in any way other than to answer a question from him about the scope of the report and then he provided the report which I forwarded as I received it to counsel.

During the period that sentencing was adjourned, I also received a substantial quantity of medical records from the parties which I've considered in connection with sentencing to the extent they are relevant.  These include documents provided by MDC to the Court at the September 5,

2024 show cause hearing which were subsequently filed on the docket by the Government.  These documents included approximately 289 pages of medical records associated with Mr. Pickett.  I then reviewed medical records for Mr. Pickett from Mount Sinai submitted by the defendant through a docket filing on October 21, 2024.  More recently, I was provided two sets of medical records regarding Mr. Pickett's surgical and oncology treatment at Mount Sinai submitted by defense counsel on April 10, 2025, and additional medical records submitted by defense counsel electronically on April 24, 2025.

Other than what I have just listed, is there anything else that I should have that I did not mention?

MR. AMMARI:  One item I just want to confirm was included in your list, Your Honor.  Probation submitted a PSR addendum as well.

THE COURT:  Oh, yes.

MR. AMMARI:  On August 15th.

THE COURT:  That is correct, I thought I listed that, but I do note that and I did review it as well.

All right.  In addition, I will note for the record that on April 29, 2025, Mr. Pickett pled guilty to one count of attempted promotion of prostitution in Queens County Supreme Court in an unrelated case.  He's not yet been sentenced, but I was informed by the parties here that

that sentencing is scheduled for May 22, 2025, with an agreement by the parties in that case to a sentence of one day in jail.

Since both parties here agreed that the new conviction would not change his Criminal History Category or his sentencing range under the guideline and since Mr. Pickett was eager to proceed to sentencing, neither party requested an addendum to the PSR and I agreed that no further addendum was necessary.

All right.  Ms. Wells, have you and your client read and discussed the PSR from 2024 as well as the 2024 addendum?

MS. WELLS:  Yes.

THE COURT:  Is either party seeking an evidentiary hearing on any issue?

MS. WELLS:  No, Your Honor.

MR. AMMARI:  We are not either, Your Honor.

THE COURT:  Okay.

Mr. Ammari this juncture I would normally inquire about victim notification, but given the charges to which Mr. Pickett pled, I understand that's not an issue here?

MR. AMMARI:  That's correct, Your Honor.

THE COURT:  Let me briefly discuss one small issue in the PSR about the statutory minimum and maximum range.

The parties agree, and the PSR reflected, that the

maximum term of imprisonment of Count One is five years, the firearms trafficking charge. The maximum term of imprisonment on Counts Two and Three, I believe, is 15 years under 18 U.S.C. 924(a)(8). But it appeared to me that the PSR had stated at page 1 that it was not more than ten years on each count.

Are the parties in agreement simply as to the maximum term, that it's 15 years, under 924(a)(8)?

MR. AMMARI: Yes, Your Honor.

MS. WELLS: Yes, Your Honor.

THE COURT: So with that correction, I will adopt the PSR and the addendum and just for the record so I know in case this is useful for Probation going forward, I've seen people get tripped up on this provision more than once, that 18 U.S.C. 924(a)(8) states that whoever knowingly violates subsections (d) or (g) of Section 922 face a potential maximum term of not more than 15 years, the other subsections come with a ten-year maximum, as well.

All right. There is a dispute between the parties that I'll address shortly about the sentencing guidelines calculation and specifically whether the enhancement under Section 2K2.1(b)(5) applies.

But do the parties agree that other than with respect to that issue, Probation, in its addendum to the PSR, correctly calculated the sentencing guideline range

with respect to the other factors?

MR. AMMARI: Yes, Your Honor. We're in agreement with Probation's calculation.

MS. WELLS: That's correct, yes.

THE COURT: So for the record, the portions of which there is no dispute is that the crimes of conviction have a base offense level of 20; a four-level increase because the offense involved 15 firearms; a two-level increase because eight of the firearms were reported as stolen; and then a three-level decrease for acceptance of responsibility under 3E1.1(a) and (b) due to his timely plea.

Mr. Pickett has a Criminal History Category of VI. If I did apply the enhancement sought by the Government at four levels, that would give a sentencing guideline range of 130 to 162 months in prison. If I decline to apply the enhancement, it would give a range of 92 to 115 months imprisonment.

Have I stated those ranges correctly?

MR. AMMARI: I believe so, Your Honor.

MS. WELLS: Yes, Your Honor.

THE COURT: Let me now turn to the sentencing enhancement question.

The parties are in agreement, as Probation indicated in the addendum as well, and I also agree that the

2021 guideline manual applies, rather than the 2023 version manual.

So the defense has objected to the proposed enhancement under U.S.S.G. Section 2K2.1(b)(5)(C) based on what it contends is an insufficient factual basis that is nothing outside the crime of conviction and nothing in the factual record that it contends apply.

As the parties are aware, that subsection prescribes a four-level increase if the defendant engaged in the trafficking of firearms but specifically in the application note the Court must find that that subsection applies if the defendant transported, transferred or otherwise disposed of two or more firearms to another individual or received two or more firearms with the intent to transport, transfer or otherwise dispose of firearms to another individual. And the Court must further find by a preponderance of the evidence that subsection two applies in that the defendant knew or had reason to believe that such conduct would result in the transport, transfer or disposal of a firearm to an individual whose possession or receipt of the firearm would be unlawful or who intended to use or dispose of the firearm unlawfully.

So I've read the parties' submissions. In the PSR Probation contended that because of the illegal nature of Mr. Pickett's conduct, the Government had met this burden,

specifically that the defendant had reason to believe that his customer intended to use or his pose of a firearm unlawfully.  And reason that, quote, the specific offense characteristic is supported by the very nature of the instant offense whereby the defendant arranged, including through the encrypted application telegram, to meet at a gas station to sell multiple firearms for thousands of dollars at a time.

Before I get to the substance of that argument, I have one clarifying question, which is which subsection at the enhancement or both is the Government arguing applies here?  That is that he was aware or should have been aware that the person to whom he thought he was selling the firearms was not legally permitted to possess them or that he thought that that individual or individuals intended to use or dispose of them unlawfully?

MR. AMMARI:  Our position, Your Honor, would be that under the facts, the defendant would have a reasonable basis to believe that both would apply.

THE COURT:  So tell me why -- it seemed to me like one concern I had about your argument is that you argued that he had no reason to believe that the guns were going to a legal purchaser or for a legal purpose, but doesn't that flip the burden?  Because don't I have to find that he actually had some reason to believe affirmatively that

either the purchaser was not able to possess them or that they were going to be used for something unlawful?  So tell me why that's not burden-shifting here.

MR. AMMARI:  Sure, Your Honor.  I think it's helpful to take a step back for a moment in terms of the nature of the offense.  The offense of firearms trafficking under 922(a)(1)(A) is not strictly limited to sales like what we saw here.  It's not only instances in which someone is making clandestine sales in a gas station parking lot to a purchaser; it can encompass other unlawful sales made.  So within the scope of the offense, it's broader than just this type of clandestine sale.  It is unlicensed dealing in firearms.

In this particular case, the nature of this offense is what we believe --

THE COURT:  Meaning, so give me an example.  So if somebody goes to a gun show and they're not licensed to be there, what types of circumstances that wouldn't involve the kind of illicit conduct you are talking about here?

MR. AMMARI:  Sure, give me one moment.

THE COURT:  Yes, sure.  And you don't have to point me to a specific real life case, but I am thinking of the kinds of things -- because you understand the argument I think the defense is making that the enhancement is meant to cover circumstances that would not apply to every case or

*Proceedings*                                        17

even most cases necessarily, but require some more specific facts.  So give me an example where there wouldn't be that type of inference that would be reasonable.

MR. AMMARI:  Sure, Your Honor.

The caveat, as I haven't exhaustively confirmed that this would be a violation, but I think one example could be if someone operates a gun store without a license. They have a business, they have a storefront, they sell guns to people, and they are not licensed in the business of dealing in firearms as 922(a)(1)(A) requires and it provides that it's unlawful for any person except a licensed importer, manufacturer or dealer to engage in the business of dealing in firearms.

So I think that would be an example of an offense that would qualify without having these illicit components to it.  It wouldn't be a situation where necessarily someone is coming into a storefront.  Based on the nature of that, that purchaser could reasonably believe they're going into a legitimate gun store, and you can know that people think that, and as a result you don't know that you are necessarily selling to someone who is likely to be engaged in further misconduct or dispose of them beyond that.

THE COURT:  I know I just said I wasn't going to press you for a specific case, but are you aware of any cases where someone in this district or Southern District or

*Proceedings*                                                18

any district in the circuit where someone's been prosecuted for having an entire, like, open-to-the-public gun store without a license to do so?

MR. AMMARI:  I'm not, Your Honor, but I think in terms of the scope of the statute and the burden shifting issue in particular it is relevant.  Whether people are prosecuted or prosecutions are brought under those facts I don't think changes the fact that within the scope of a statute there are many ways to violate it.  And this particular way of violating this statute, this particular type of clandestine sale, does have components to it that it gives someone a reasonable cause to believe that those firearms are going to be used unlawfully or go to people who should not be possessing them.

And I think here, just to underscore the facts, these deals were done in a gas station parking lot.  The defendant was communicating with the individual purchaser over messaging apps that are often used in furtherance of illegal activity.  These sales involved multiple firearms at a time in significant quantities.  And when you look at the history of the defendant as well of having a history of illegal possession of weapons, I think all of that together gives reasonable basis to conclude that when the defendant was doing these sideshow deals in a gas station parking lot, selling to someone who is not going to a legitimate gun

store, someone who is getting these through an illicit channel which the defendant knows is illicit, I think there is more than a sufficient basis to conclude that the defendant had a reasonable cause to believe that these firearms were not going to be used lawfully or possessed lawfully.

THE COURT:  Okay.

Let me have you respond to the defense's argument that all of the facts that you've described, the concealment, and I certainly don't disagree with you, encrypted messaging, you know, the unusual location, is all entirely consistent with what the defendant has accepted responsibility for, which is concealing his own illegal conduct.  He was a felon who was not permitted to possess the firearms and he certainly wasn't legally privileged to sell them.

So why isn't all of that the type of thing that would apply to anyone in Mr. Pickett's position who seeks to conceal his own conduct?

MR. AMMARI:  With respect to this particular enhancement, I think what we're looking at is the nature of the sale, the nature of what the defendant knows, and it would be relevant.  I don't think -- I don't know every scenario of how it could play out if someone with a history of being a felon in possession, for example, would be

prosecuted for firearms trafficking, so I don't want to speak exhaustively on that.

What I do think is, though, here when you look at these particular set of facts, the defendant's history is relevant in part because he understands the restrictions that come along with being a felon with respect to being able to own a firearm. And he also understands that when you can't have one, you can't go through the normal channels of getting a gun. And it's much easier to just walk into a gun store if you can do it legally, get the gun and have it registered. There are reasons why people don't do that and those are things that I think tend to be associated with unlawful conduct.

So here, the broader circumstances, we're not just looking at one component here. We're not just considering the fact that the defendant had a history of being a felon in possession. We're looking broadly to what are the circumstances of these sales? They are clandestine sales organized via telegram with a purchaser for multiple guns at a time, done in a gas station parking lot on multiple occasions within just a couple of weeks of each other with 15 firearms. I think that is a very clear case, Your Honor, for an instance in which the facts support the enhancement.

THE COURT: Thank you.

Ms. Wells, let me have you briefly respond.

MS. WELLS:  Sure.  So I think these quote/unquote clandestine circumstances merely suggest that the transaction itself might have been illegal, the transfer of the firearm itself may have been illegal, and that Mr. Pickett knew that.  But more is required.  The Government has to prove that the buyer -- that Mr. Pickett knew or had reason to know that the buyer was a prohibitive person or that that buyer was going to put the firearms toward an unlawful ends, and they haven't proven that. There's nothing in the record or in the PSR to show that there were any discussions with the undercover officer about his prior criminal history that would lead Mr. Pickett to believe that he was a prohibitive person.  There were no discussions with the undercover officer about where these firearms were going.  So it's reasonable to think that this buyer may have been purchasing the guns for a personal collection or for personal use or some other legal means.

And I am just going to touch briefly on a couple of the cases that were relied upon by the Government in their papers that I believe are distinguishable.

THE COURT:  I actually read them, so I think I don't need you to.  I think I understand those cases.

MS. WELLS:  So I won't get into that --

THE COURT:  But I appreciate your review of them.

MS. WELLS:  Yes.  The transactions were obviously

illegal in those cases.  Like what the undercover officers in those cases were going to do with the firearms had been discussed with the defendant, and we don't have that here.

THE COURT:  All right.  I am going to defer my ruling on my guideline range until I hear from you all on the other 3553(a) factors.  I will rule on it today, but I just want to give it a little bit of thought.

So let me now turn to some of the 3553(a) factors I wanted to discuss with you all.

Let me ask you, Mr. Ammari, I know the defendant noted in his sentencing submission that the sentences he received as a result of the 2018, I believe, Probation violation overstate his Criminal History Category because technically he got five separate sentences for a single Probation violation that related back to the five prior convictions for which he was on probation.  They were all suspended sentences as to all but one, but the way that they were structured is why his Criminal History Category went to a VI and not a V.  So there is no error in the calculations, but I think the defense is urging me, as Probation acknowledged in their own assessment, to take that into account in considering where it would fall into the guidelines or whether the guidelines sentence really reflects the culpability of his conduct and his criminal history.

Do you disagree with Probation's assessment here?

MR. AMMARI:  In our view, I think the Criminal History Category is not -- it does not overstate his conduct in the past.  I think that if you look at his convictions, he has violent felony convictions, he has several convictions for possession of firearms.  And that is in line with what he is charged with today.  And I think when we are thinking, taking a step back for the purpose of 3553(a) factors, when we're looking at the history and circumstances of the defendant, whether what he's done is appropriately reflected in the criminal history, I do think here it is accurate, Your Honor.

THE COURT:  Let me ask you about the question of how the statutory maximum for these counts intersects with the guideline range.

The defense made an argument that, at least with the felon in possession counts, because the statutory max is five years, and your recommended range even at the low end of the guidelines you are now proposing would exceed, even if I were to give him consecutive sentences on those counts or even if I were to give him something very close to the statutory maximum on the felon in possession count, that we're really talking about something that comes very close to the statutory max and consecutive sentencing in order to get to that guideline range.  And whether that's really

*Proceedings*                                                    24

appropriate in light of what's now on the record and all the facts and circumstances.

So let me have you speak to that.

MR. AMMARI:  Sure, Your Honor.

First with respect to the statutory maximum, I think it's 922(a)(1)(A) that has the five --

THE COURT:  Sorry, I misspoke.  I meant to say felon in possession charge.

MR. AMMARI:  In considering whether in any given case the statutory maximum is appropriate, I think it's helpful to situate the conduct that's at issue and the history of the defendant in the appropriate context.

Here, we have someone who has been convicted in the past of several offenses relating to firearms and nonetheless was continuing to deal in firearms.  This is not someone who it's their first time dealing with unlawful possession of a weapon.  This has been a repeated issue.

So in terms of imposing a sentence that is approaching the statutory maximum for that offense, I do think, looking at his history, this is a case where that would be warranted.  It would be more appropriate to get close to the statutory maximum.

THE COURT:  Let me ask you about one argument you made about the family circumstances in your original submission from 2024.

You had noted in responding to the defense's argument about his family circumstances and his role prior to this recent incarceration as a caretaker for his young children and his history of parenting his then-nine-year-old daughter, that given the defendant's proclivity for possessing illegal firearms it's undeniable that his children are safer in an environment without the exposure to dangerous and deadly weapons.

Is there any evidence that there were ever any illegal guns in the home or that any of these transactions took place inside the home where the children were present that you are aware of?

MR. AMMARI: If you would give me one moment, Your Honor.

THE COURT: Sure.

(Pause in proceedings.)

MR. AMMARI: Thank you, Your Honor. I just wanted to double check the PSR.

Not off the top of my head that I am aware of. Not to say there weren't instances, but I am not aware of one at the moment.

THE COURT: Sitting here today, I know you wrote this some time ago, but what was the basis for the argument that these children were safer in an environment without the exposure to dangerous and deadly weapons?

*Proceedings*                                                          26

MR. AMMARI:  I think that is a well-established fact in our society for better or for worse that there are a lot of problems that come from having children in homes with weapons.

THE COURT:  Right, but given that sitting here today you are not aware that there were any weapons in the home and don't recall that and there is nothing in the PSR that we are aware of, because I didn't see anything there either.

MR. AMMARI:  Sure.  I think nothing explicit. What I would say is the defendant has a repeated history of unlawfully possessing guns.  Here he had 15 between the two sales.  He is keeping them somewhere.  And often individuals do keep guns at home.  It is a common place to store weapons.  So I wouldn't overstate what I know and say I know that he had guns in the home, but I do think it's a fair inference from his history of firearm possession and the way that people generally store firearms in their homes that it's a reasonable possibility that he was going to have guns near children, and that is a very serious risk.

THE COURT:  Let me turn briefly to the portion of the defense submission that talked about Mr. Pickett's three years of incarceration on a murder charge that was ultimately dismissed beginning at age 18.

The defense has represented that he was falsely

accused and that all charges except a plea to an unrelated charge of obstruction of justice were dismissed.

I know you said in your submission that the records weren't available, but based on your own inquiries and investigation, do you have any reason to dispute Mr. Pickett's contention that he was incarcerated for three years as a very young man for a crime he didn't commit?

MR. AMMARI:  I -- we would not concede that.  What I would say is that my colleague, AUSA McTague, she initially handled this submission, I was on trial at the time, I don't know if she had more information from consulting with the prosecutor who handled that than what was put in here, but I haven't spoken to her since then, so I don't know if there is more evidence available.  But without knowing the facts, we, of course, cannot and would not concede that he was not properly incarcerated for that offense.

THE COURT:  Right, but there's not conceding when you're an attorney standing up on the case and then there is just not having any information.  And based on anything known to you or to your colleague, is there any reason at all you have for me to question the defendant's representation that there was not evidence that he committed this crime and, in fact, that he didn't based on what you have known, any communications with those local authorities,

anything in the records that you all provided, anything like that?

MR. AMMARI:  I haven't reviewed the records or spoken personally with those lawyers.  What I will say is I understand that that led to a conviction for obstruction of justice.  It is not uncommon for people to be charged with one offense and then plead guilty to another.  And in this case, given that there was a guilty plea, I do think that is a very clear basis to disagree with the assertion without knowing the full set of facts that he was not guilty of that crime.

THE COURT:  My recollection, though, it's been some time, from the defense submission, was that the obstruction charge was related to unrelated conduct; that it wasn't related to any allegation of participation of the murder or covering up of the alleged murder; is that right?

MS. WELLS:  That's my understanding, Judge.

And that section of my sentencing submission was based on our own investigation.  We were able to order some records.  We were able to obtain some records from North Carolina and you know, I do think it's highly unusual.  Yes, people every day plead down to lesser charges.  I think it would be highly unusual for the Government in the south to dismiss murder charges and allow someone to plead to obstruction if they had, in fact, participated in a murder

and I think that in itself suggests that Mr. Pickett was not guilty of that -- or in fact was innocent of that murder.

THE COURT:  Mr. Ammari, let me now turn to some of the events that took place since that last submission.

Your supplemental letter from April didn't address Mr. Pickett's cancer or his treatment or the pain that he reported experiencing at MDC in any detail other than to note, in your words, that he was unfortunately diagnosed with cancer while at MDC and that he is now in remission.

Is there anything at all that you wish to say on that topic and how it should factor into the 3553(a) analysis?  I know that you have revised your estimate to go to the lower end of your proposed guideline range, but just in the 3553 analysis, is there anything you want to say on that topic?

MR. AMMARI:  I think that was explicitly addressing it, Your Honor, and it is a fairly significant departure from our initial request.  I wouldn't say that it is substantial for us to have gone from a request or recommendation of 150 months in custody down over a year and a half to 130 months.  So I think it is, from our perspective, we have certainly addressed that and we have acknowledged the cancer diagnosis and understand that it is -- we don't say unfortunate to minimize.  It is a difficult thing and as reflected in our submission, we

accounted for that in our new recommendation for a sentence for the defendant.

THE COURT:  Is there anything that you want to say about the findings in Dr. Venters' report?  Anything you found erroneous, objectionable, that you think is important for me to consider in either direction?  Anything along those lines?

MR. AMMARI:  Two points.

First, Your Honor, as a general matter sitting here in the criminal division, we are not in a position and do not concede that there were any deficiencies in Mr. Pickett's care.

And second, with respect to the factual basis, if this were to be a fully addressed and litigated issue, there would be other experts who would come and evaluate it.  It would be a much more thorough and exhaustive analysis of what happened and what could have been done differently, if anything, what, if anything, would have been a different outcome.

Those facts just don't exist.  So beyond not being in a position to concede, we also don't have the facts to be able to determine that one way or the other.  That's not our expertise.  So for that reason, we would, I think, stand our objection to any sorts of findings with respect to whether the care was appropriate and leave it at that.

THE COURT:  I am certainly not expecting you to make a concession on behalf of the Government about the constitutional adequacy of care or whether it met any 8th Amendment standard that Mr. Pickett is entitled to have while he is in pretrial detention.

I think I was a little surprised to hear you say you wouldn't concede that there were any deficiencies in care, given some of what I understand to be the undisputed facts.  In particular, the portion of Dr. Venter's report where he simply noted the time lag between Mr. Pickett's reports of severe pain, at times a ten out of ten, especially starting on May 1st of 2024, before he was seen by anyone at the facility and even longer delays until he was seen by a doctor or had the mass in his leg biopsied.

Just on the pain level, the delay on being seen, would you concede that that was -- even if you don't want to use the word deficient -- not acceptable, wrong, harmful?  Anything along those lines?

MR. AMMARI:  At this time we would not make any concessions with respect to any of the facts, Your Honor.

What I would note is that we noted in our sentencing submission that we acknowledged the defendant's diagnosis and we have revised our recommended estimate to account for his cancer diagnosis and ongoing treatment provided in BOP care as part of reducing our recommendation

by 20 months.

THE COURT: Okay.

Let me look prospectively now for a second.

As you know the letter from Dr. Iofin from Mount Sinai indicated that Mr. Pickett's at risk of further injury including what the doctor noted was the risk of future amputation of his leg if he suffers a fall while he is still recovering from surgery or additional rounds of chemo.

And do you have any comment at all in light of what the defense cited in it's letter about the concerns of that if I were to sentence him to an additional term of incarceration, the risk, for example, someone could be bumped or shoved or be targeted for violence at another prison and if they are, may not get timely medical care? I know certainly there are units that specialize in medical care, but as the Office of the Inspector General has documented, there are severe staffing shortages in those units as well. So whether or not it's due to staffing issues or simply the inherent nature of interactions in an incarcerated population, how am I to assess that risk given the risk of something so severe as amputation?

MR. AMMARI: With respect to care, over the past eight months, the defendant has received a significant amount of care while he's been in BOP custody. Carewell, in additional facilities that I won't name just to be cautious.

With respect to bumping into people, I think that things like that can happen anywhere, Your Honor, but --

THE COURT: You don't think there's a heightened risk in crowded facilities or prison environments, particularly not just given the number of people and the conditions, but who else is incarcerated there?

MR. AMMARI: I don't want to focus on this; rather to focus on the broader context of the fact that he has been receiving care for a number of months in BOP custody.

THE COURT: Right, but I am asking you to talk to the prospective part, not what's happened previously.

I understand the care that he's received over the last nine months or so since we found the treatment plan for him at Mt. Sinai. I am really looking ahead. It's not like someone who just has a chronic condition that needs to be monitored. This is a situation where his own doctor at Mount Sinai said that he could lose his leg if he's injured in the future.

So that's what I want you to address and how that should factor into any further period of incarceration or the length of incarceration.

MR. AMMARI: Sure.

The critical question would be: Can he get adequate care? And I think over the past eight months, he has received a significant amount of care. So I think Your

Honor said you want to focus on prospective, but I do think that that care that he's been receiving and continues to receive is reflective of the fact that he can receive necessary care while in custody.

THE COURT:  All right.  In your original submission -- and this was of course before the cancer diagnosis -- you noted -- I think it was page 11 -- that no period of incarceration would deter Mr. Pickett from committing similar crimes given his criminal history.

Do you still think, in light of what he's been through for the last 16 months, 18 months, that what he's experienced so far isn't a sufficient deterrent for the future and he needs to go back to prison and have a guidelines sentence to achieve a goal of deterrence, or is that not what your argument's based on any longer?

MR. AMMARI:  We continue to believe that.  I think what we have to go on, I'm not inside the defendant's head. I don't know what he is thinking when.  What I can look at is the history of his conduct and what he's been exposed to in the past in terms of factors that can deter him from future misconduct and what's happened after that.  And the defendant has time and time again received convictions and been sentenced for offenses, violent offenses, offenses involving firearms, including in this most recent period, over the past year and a half, he has been resolving cases

for firearms trafficking and being a felon in possession as well as prostituting what I understand to be a 14-year-old girl.

So I think the defendant's history here is extraordinarily serious and reflects that he has not taken responsibility and decided to not commit and engage in further misconduct. So apart from just ensuring that he needs -- gets the deterrence that is required, we also have to consider what is appropriate in order to protect society and make sure that, as a general public, there is deterrence for these types of offenses and repeat offenses.

I do continue to believe that a guideline sentence is warranted, Your Honor.

THE COURT: Ms. Wells, let me turn to you now.

You had, back in 2024, before the adjournment, presented a proposed reentry plan developed with the aid of your mitigation specialist who had worked with Mr. Pickett over an extended period of time.

Tell me what the current status is of that in light of his medical condition and his history. I know in your original plan when you were asking me to consider a sentence of 36 months, there was going to be some transitional period in which he would be in another BOP facility for some additional planning period before his release. Now you are asking under the extraordinary

circumstances presented here for me to consider time served.

So what adjustments, if any, does that make to the plan in terms of the transition time, but also in terms of his employment prospects, all of the things that you have worked to come up with the last time around?

MS. WELLS: Sure.

So things have changed a bit. Originally, so before Mr. Pickett's incarceration, he had owned a lawn care company with his uncle, James Madison, and it was pretty successful. I believe at a certain point in time, they had employed five people. You know, but it involved manual labor, going out, mowing people's lawns, of course, landscaping, things of that nature.

Given Mr. Pickett's current medical condition, that's not an option at this moment.

And so the plan now is for him to live with his parents in North Carolina. They're going to make sure that he gets to all of his medical appointments, that he sees the physical therapist on a regular basis so that he can get back on his feet and back walking and back where he needs to be physically.

But Mr. Pickett is -- all of the plans that are laid out in the reentry plan, there are still goals of Mr. Pickett. So he still wants to accomplish all of those things. He has to focus on his health now, but when he is

physically able, he wants to restart his lawn care company. He wants to seek treatment, and I believe that treatment is actually something that he can do immediately. He's still interested in seeking both mental health and drug treatment to sort of address a lot of the issues that he's had in his life.

So all of that is still on the table, Judge.

THE COURT: What is your answer to the Government's argument that the nature of the offenses is so dangerous, particularly in light of his history, that at least some additional period of incarceration is necessary to separate him from the public for longer than the past terms he's received given the seriousness of the offenses and the prior history?

MS. WELLS: So I had listed a number of cases in my sentencing submission that the Government did not address that set forth conduct that I believe is more serious than Mr. Pickett's conduct and those individuals were handed down sentences that are far less severe than the sentence that the Government is asking for. So if you are looking at cases in this district, I think a sentence of 36 months falls in line with other cases, other sentences imposed in this district.

In addition, Judge, I'll just say that Mr. Pickett's cancer diagnosis has been life-changing for

him.  This has been a wake-up call for him.  And I have had discussions with him about this.  He describes it as a near-death experience.  You know, since September, I believe that's about eight months, he spent eight months in a hospital room by himself shackled to a bed with nothing but time to think about what has brought him to this point.  And in doing that, he's realized that he has to make a change, he has to do things differently.

He wants -- he has six children.  He wants to be there for his kids.  For the past eight months, because of the policies of the hospital, his children have been unable to visit.  There have been restrictions on his phone calls so he's not, you know, able to communicate with them as much as he would want them and that's been very difficult for him.  But he's had a lot of time to think, Judge, and he is taking this cancer diagnosis as -- he's looking at it as a turning point in his life.

And I think it's also worth noting that before his diagnosis, he had been meeting with our reentry specialist over the course of nine months.  And during that time, he showed a change in mindset.  And so when he worked with Mr. Williams, you know, they discussed not only what he would do when he was released from prison, but they also worked on mindfulness tactics, approaching -- how to approach negative thoughts and desires to engage in negative

behaviors. So sort of restructuring the way that he approaches problems, has approached his life in the past, you know, he spent nine months working on that. So he's never received any sort of therapy, counseling or treatment in the past. So I think those sessions with Mr. Williams were very valuable for him and actually have shifted the way that he wants to approach things going forward.

So I will just reiterate, Judge, that this whole experience has been incredibly life changing for Mr. Pickett. He values his life in a way that he never valued his life before, and he wants to make a change.

THE COURT: I know he had never been a client of your office in this district before, but had he ever had the benefit of reentry planning during any of his prior terms of incarceration if you know?

You can ask him if you need a minute.

MS. WELLS: No, Your Honor.

THE COURT: Ms. Wells, before I turn to Mr. Pickett, is there anyone else who wanted to speak on his behalf or should I hear from him now?

MS. WELLS: I believe that you can here from him.

THE COURT: Mr. Pickett. You can use Ms. Wells' microphone so we can see each other and we can hear each other.

THE DEFENDANT: I just wanted to say thank you to

all the people on my legal team for helping me get through these hard times, and I am thankful for another chance at life.

This mere experience and near-death situation fighting cancer has really changed my outlook on life and I am sorry for the crimes I committed and accept my consequences and I am done with the life of crime and ready to be back in society and become a law-abiding citizen. I found God since incarcerated and also removed myself from all gang activities. I've become a better man and matured a lot and I really need to be there to provide for my six kids who really need me in their life.

I also have experienced very harsh conditions since being incarcerated, from medical neglect to unnecessary lockdowns, and just hope the Court can put that in consideration in my case.

And thank you for giving me the chance to speak. And God bless you all.

THE COURT: Anything else from any of the parties before I -- I'm going to take a short break before I discuss the guideline issue and sentencing.

MR. AMMARI: One thing, Your Honor. I apologize if you mentioned this before and I missed it. I heard you ask Ms. Wells if she'd reviewed the PSR.

THE COURT: Yes.

*Proceedings*                                      41

MR. AMMARI:  I just wanted to confirm for the record as well that Mr. Pickett also reviewed the PSR.

THE COURT:  I did ask if she reviewed it with him, so that was implicit.

But Mr. Pickett, you had a chance to review the PSR?  It's a legal requirement that you get to review it, yourself, personally?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And then there's what's called an addendum that addressed the sentencing guidelines issue which came after the initial PSR, did you get a chance to review that as well?

THE DEFENDANT:  Yes.

THE COURT:  Ms. Wells, anything further from you?

MS. WELLS:  I will add this, I detailed this in my sentencing letter, so I won't go through it all in detail here, but across the Bureau of Prisons, the medical care is problematic and completely deficient, really.  If he's sentenced to an additional term of incarceration, I believe, you know, and his cancer recurs, we are going to be right back to square one in the same situation that he was in, in terms of delayed diagnosis of his cancer.  And this could be deadly for Mr. Pickett.  No other defendant who is facing this sort of conviction, illegal dealing in firearms or felon in possession of firearms, faces a death sentence and

that's what Mr. Pickett could potentially face if he is designated to a Bureau of Prisons facility. They are completely incapable -- it's well documented. They seem to be completely incapable of getting the people to the medical appointments, which is essential for Mr. Pickett to detect any recurrence of cancer. There are numerous instances of people's cancer being delayed by months sometimes even years resulting in mortality, whether it would have otherwise been a treatable form of cancer.

And so for that reason alone, Judge, I think that time served is warranted in this case.

THE COURT: Thank you all very much.

Let me take a break and I will come back in about ten minutes and we'll proceed to the rest of the hearing.

Mr. Pickett, if you need to go back and use the facilities or just do what you need to do, please feel free and I will see you back all here at about 12:10. Thank you.

(Recess taken.)

THE COURT: You can all be seated. Thank you.

We are back on the record. Thanks for your patience.

So first let me address the sentencing guidelines questions we discussed earlier and, specifically, whether the four-level enhancement under guideline 2K2.1(b)(5) applies.

I think the parties made reasonable arguments on both sides and it was a close question, but I have decided that it is not appropriate to apply the enhancement on the fact of this case. The guideline and the application note make clear that to apply the enhancement, the Court must find something more than the conduct demonstrated on this record even though what Mr. Pickett did, as he's acknowledged, was undisputedly illegal on his part and he knew it to be so. There are certainly scenarios, as the Government has indicated, that someone could violate the statute without having the specific enhancement apply, so I don't think it would require for me to adopt the Government's position to say that there would be no case in which someone committed the crime of firearms trafficking, but did not qualify for the enhancement.

That said, it seems clear that the drafters contemplated something more and, specifically, that this significant enhancement is addressed at those categories of defendants who have specific reasons to know or actual knowledge that the persons to whom they believe they are selling the firearms are, themselves, breaking or planning to break the law in the specific enumerated ways.

I did consider and look closely at the two cases identified by the Government that it believed were most closely analogous to this one.

The first was *United States versus Mujaahid*, 2023 Westlaw 4417356, at 2, from the Second Circuit July 10, 2023, in which the circuit upheld the imposition of the enhancement on plan error review.  The Court reasoned that the defendant's illicit street sales of three firearms were sufficient to show that he had reason to believe that he was transferring a firearm to an individual who intended to use or dispose of the firearm unlawfully.

This case did generally support the Government's position, but critically the Court relied on the fact that not only did he sell a stolen firearm, but he also sold a sawed-off shotgun to the confidential informants and that gave the Court a clear evidentiary basis on which to find on plain error review that the application of the enhancement was appropriate because the buyer reasonably intended to use the shotgun, the sawed-off shotgun for this unlawful purpose.

The second case also from the Second Circuit, *United States versus Jennings*, 2020 Westlaw 2799889, at 3, April 26, 2023 seems quite distinguishable.  The Government focused on the Court's statement that the discrete nature of the transactions by which the CI was obtaining the firearms gave the defendant reason to believe that the guns were headed to an illicit market.  However, the Circuit also relied on the fact, which is not present here, that the

*Proceedings*                                                    45

buyer specifically represented to the defendant that he

intended to set up a market for the guns.

So in the absence of any authority applying it in

these circumstances and given that it is a substantial

enhancement that applies to specific delineated conditions

and circumstances, I think it would be error for me to apply

it here.

So that is my analysis.  In light of that

determination, then, with respect to the guidelines range,

there will be a base offense -- excuse me, a total offense

level of 23, which, as the parties agreed, gives a guideline

range of 92 to 115 months imprisonment.

All right.  Let me now turn to the imposition of

sentence.

After due consideration of the guidelines and the

factors set forth in 18 U.S.C. Section 3553(a), I have

decided to vary downward from the guidelines and impose a

term of time served.  That equates to slightly over

31 months in custody calculated from the date of

Mr. Pickett's arrest and remand to MDC in September 2022.  I

will also impose a three-year term of supervised release

along with certain additional conditions that I will

discuss.

Let me now give the required statement of reasons

to explain my sentencing ruling and I will go over each of

the specific terms and conditions of Mr. Pickett's sentencing in more detail to make sure that you understand them.

I will also note, as I said, that the parties presented reasonable arguments on both sides about whether the sentencing enhancement applied here and ultimately though I found that the Government had not established that the specific circumstances existed to apply that enhancement given the exceptional circumstances of Mr. Pickett's case and history, I would have imposed the sentence of time served that I did under 3553(a) even if the higher guideline range had applied.

So as the parties are aware, not all of the 3553(a) factors apply in every case and ultimately I must impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of the sentencing statute.

I must consider all the factors as applicable and I have done so here. They are listed in the statute, so I will not recite them for the record, but I will explain my analysis as they apply.

Let me start with the nature and circumstances of the offense, which are undisputed and for which Mr. Pickett has accepted responsibility. He was a felon in possession with multiple felonies and was well aware that possession of these weapons was prohibited in light of his prior

convictions.

As for the firearm trafficking, he engaged in two separate transactions, a completed sale of ten illegal weapons for a sale price, total sale price for the ten of what the Government has indicated was $11,500, and one attempted sale of nine firearms for an agreed price of $11,000.

He was in a Criminal History Category of VI because of multiple misdemeanors and felonies as detailed in the PSR as well as the more recent plea to the attempted trafficking and prostitution charge -- excuse me, the facilitation of prostitution charge.

He also had prior probation violations in 2018 and '19 for failure to comply with house arrest and electronic monitoring and for a positive drug test.  I have reviewed each of those priors.  I will not recite them here, but I have considered them.  That does, though, ultimately, because of the nature of the number of his priors, take his guideline range far in excess of many other defendants in this district and elsewhere who have been convicted of these crimes and in fact have more serious aggravating circumstances in the crimes of conviction.  For that reason, a broader and more fulsome analysis of Mr. Pickett's history and characteristics in the last three decades, since he's been alive, are particularly crucial in the 3553(a)

analysis.

So I am going to address that history in two parts. First I, am going to talk about the factors that were presented to me before Mr. Pickett's cancer diagnosis, and then I will talk about the factors that relate to his diagnosis, treatment history and his ongoing medical needs.

First, it's quite clear from the sentencing submission, Mr. Pickett, that you faced enormous hardships and challenges in your youth, a real avalanche of traumatic events from early childhood through your young adulthood. As detailed in the defense's original submissions, these included your parents' drug and alcohol abuse and violence, being raised in a neighborhood in Queens that was plagued by drugs and violence and personally witnesses episodes of lethal violence and suicide in your community including two violent deaths of people that you knew that you personally witnessed before the age of ten.

Mr. Pickett then had a period at age 15 in which his parents, for various reasons, each moved away and left him to essentially raise himself in North Carolina. That culminated with him being a victim of gun violence himself when he was hit by stray bullets at age 22. That incident, through no fault of his own, led to chronic pain and a subsequent opioid addiction which dovetailed with a number, not all, of the state crimes as detailed in the PSR.

In addition, there was a period of approximately three years where Mr. Pickett was incarcerated pretrial as a suspect in a murder, ultimately pled guilty to a very minor charge of obstruction of justice, and while I don't make any findings as to what actually occurred, certainly three years is well in excess of the time that anyone would serve on the charge to which you ultimately pled and the Government's offered no reason to discredit your representation that the records show significant concerns about whether you were actually innocent of the murder charge for which you served all that time pretrial.

Despite the substantial number of prior convictions on his record and the fact that he violated probation in the past, I do think that Mr. Pickett has a strong rehabilitative potential at this particular juncture in his life despite the medical challenges that he's faced.

This includes his employment history, in particular, unlike a number of defendants including those with long criminal records who come before this Court, he has a history of gainful employment and, indeed, has shown some really significant initiative starting a lawn care business with his uncle, then employed a number of staff and some initial success as a hip hop artist in a very competitive field.  He did so despite some enormous challenges from his childhood and early adulthood, as I've

noted.

And in addition to providing day-to-day parenting and financial support for his children when he wasn't incarcerated, I received a letter from Minster Stephanie Bowman, from his home community, who described how Mr. Pickett had reliably and frequently given her rides to church and food whenever she reached out and needed assistance and described him as polite and respectable. Also his mother, who despite acknowledging his crimes, also noted the critical support that he's provided to her and her then-disabled husband.

And I understand from today's presentation that your parents are eager to have the opportunity to return the care that you have shown to them and to help you with your rehabilitation and treatment going forward.

I received a reentry plan designed by the mitigation specialist contracted with by the Federal Defenders, Larry Williams, whose background is notable for his lived experience as well as his academic and professional track records. It's far more comprehensive than anything that was previously available to Mr. Pickett in his past periods of incarceration. This was not something cobbled together on the eve of sentencing. It involved multiple visits, laying the groundwork and getting to know Mr. Pickett and designing a program that accounts

for his past trauma, wrongs and mistakes, but also his considerable strengths and potential with a multifaceted and community-based approach.

Mr. Pickett's children also provide a strong incentive to follow through on rehabilitation and minimize the risk of recidivism and the threats to the public and his ability to follow the law. I have noted the strong bond with his family in his letters, especially from his fiancee, Ms. Knox, who works full time in the mental health field while raising two children and working to obtain an additional degree in criminal justice at Strayer University. The letters described his close bond with his daughter, Ivy, who last year was age nine and the impact of her on his incarceration thus far. He also had preschool-aged children who were at the time age three and two and I now imagine are four and three with Ms. Knox, and she described his consistent presence and active parental role in their lives, particularly with the older child before his arrest.

I do pause briefly to note my concerns about the Government's response to the defendant's assertion that his bond with his children and his responsibilities toward them should be a mitigating factor under 3553(a). The written submission, which I recognize Mr. Ammari didn't prepare, as he's informed me today, came perilously close in arguing that his children would be better off without him.

Especially since there is no evidence that guns were ever in the home or ever near the children or that he'd ever been anything but a loving parent towards them and, in fact, there was a lot of affirmative evidence of that fact, I don't think it was appropriate to argue that they were not safe with him in the home despite his priors and the conduct to which he admitted conducting in the Eastern District of New York.

The Government also argued that the fact of his prior incarcerations showed that his children, quote, can subsist without his support. That was from page 11 of the original submission. I don't think the only inquiry or even the primary inquiry is whether Mr. Pickett's presence in the home is needed to ensure that his children nearly subsist economically. Like all children, Mr. Pickett's children are entitled to far more than mere economic subsistence. They have a need for both parents' love, support and physical presence in the home.

And any court that takes its obligation seriously at sentencing must think long and hard about the impact of incarceration on that aspect of the parent-child relationship that's particularly shown. So where the record shows that a defendant like Mr. Pickett has put in the time and effort to be present for and support both his partners and his children and have a strong bond with them, that is

not to say that even for devoted parents some significant period of incarceration would not be warranted despite disruption to that bond, but he has already had a lengthy disruption of his physical presence in the home and I've considered far more than their right to have subsistence in weighing this factor.

That said, Mr. Pickett, let me just say this: I know you are both a victim of gun violence yourself and the parent of young children, so you of all people I trust know how much grief and harm the weapons that you possessed and sold can cause in the community. And with the support of your legal team and the guidance you have had from Mr. Williams, the first time I understand that you have had anything that approached psychotherapy or counseling, I hope that you have managed to remove whatever detachment you may have once felt from the potential consequences of these guns on other people's lives.

Having heard you speak here today and having presided over your case for nearly three years, I believe you now have a real sense of the enormous pain and trauma that these weapons could have caused if they had made it into the wrong hands and that we won't be seeing you here again for anything like that conduct.

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. I think this is also a

critical juncture for Mr. Pickett's rehabilitation for the reasons stated in defense submission and in light of all he's been through medically as well as at MDC.  I think since 3553(a)(2)(D) requires me to consider those opportunities for rehabilitation in the most effective manner, it is more effective to have that happen in the community than in an additional incarcerated setting.

Let me briefly discuss the need to avoid unwarranted disparities and proportionality.

I did review the cases cited by the defense in their original submission at pages 7 to 9.  While it's only a sampling of cases, it was a meaningful enough one to establish and satisfy me that there have been a significant number of other defendants in this district as well as in other districts in this circuit convicted of firearms trafficking offenses and unlawful possession who received far lower terms of incarceration than the guideline range for Mr. Pickett for comparable or even worse offense conduct.

That so, even though their cases contained many aggravating factors that aren't present here, including playing principal roles in gang-related trafficking or international smuggling conspiracies, specific awareness that the weapons they sold were intended to be used for the commission of violent crimes or ones in which the defendants

were themselves law enforcement officers or involved in drug trafficking offenses.

For example, Judge Ross's decision in *U.S. versus Maralit,* cited in the defense memo at page 7, gave a sentence of 36 months, significantly below the guideline range despite the fact that the defendant in that case was an officer with the NYPD who engaged in egregious abuses of trust of the authority that office gave him and profited significantly from his crimes.  There were other sentences that ranged from noncustodial to 27 months for comparable conduct.

I do recognize that Mr. Pickett's guideline range is due not just to the offense conduct, but in large part to his own fairly lengthy criminal history at a young age, but I think a sentence within that range would unfairly and unwarrantedly elevate those factors above all else.

So all that I have discussed now, of course, is even before I've considered the medical issues that led to the sentencing adjournment last year and all the pain, suffering, and quite literally risk of loss of life or limb that Mr. Pickett has undergone for the last 18 months.

I think there would be grounds for a substantial variance given the conditions that he endured at MDC even before we get to those medical issues, but the combination of the pre- and post-cancer diagnosis factors is ultimately

*Proceedings*                                                        56

why I included that a time served sentence is appropriate.

Those pre-diagnosis factors include, but not limited to, the extensive lockdowns at MDC, particularly in the spring and summer of 2024, that further limited Mr. Pickett's access to his children even by telephone and his family being of limited means could not visit him in person.

As the parties recognize under 3553(a), I have extremely broad discretion to consider conditions of pre-sentencing confinement as grounds for a variance. Those apply not just to the history and characteristics of the defendant, but also factors of just punishment and general and specific deterrence. And, in particular, I think it's instructive to look at First Step Act cases under 3553(a) in which the courts have granted sentence reductions that were warranted in part because the time already served was more punitive than intended at the time of sentencing.

For example, Judge Engelmayer considered that factor in *United States versus McCray*, number 17-CR-642, 2021 Westlaw 142277, at 4, SDNY January 15, 2021. In that case, the Court found that because of the conditions of confinement during COVID, the defendant's term in custody, quote, has proven more arduous than the Court intended or anyone could have anticipated. He cited two cases that predated the pandemic including *United States versus Carty*

264 F.3d 191, 196, in which the Second Circuit considered a challenge to the District Court's holding that it lacked the authority to grant a downward departure based on conditions of confinement in the Dominican Republic with the defendant had been held pretrial for a portion of his time.  And the Second Circuit held that the Court may have misapprehended its authority in this case and that presentence confinement conditions may, in appropriate cases, be a permissible basis for a downward departure.  That was from 2001, of course, a pre-*Booker* case, where the issue was a departure.

The Court did, in *Carty*, rely on the fact that there was no indication that the commission contemplated that federal presentence detainees would be kept in any pre-detention facilities other than federal facilities, indicating that its holding could be limited to conditions in non-federal facilities.  But in McCray, the defendant was incarcerated in a federal facility and Judge Engelmayer applied its reasoning.  Nonetheless, I also agree with Judge Engelmayer that particularly harsh or punitive periods of presentence custody can be factored into the 3553(a) analysis.

Similarly, I will just discuss briefly and perhaps more applicable in *United States versus Mateo*, 299 F Supp. 2d. 201 SDNY 2004, Judge Marrero found that the particularly harsh and traumatic conditions of confinement in pretrial

detention warranted pre-*Booker* downward departure.  In that case, Ms. Mateo had suffered sexual abuse at the hands of a guard in pretrial detention and that she was twice ordered to strip and stand naked before the male guard and threatened with discipline if she did not submit.  And while pregnant went into labor for 13 hours in her cell before she was given medical assistance with delivery.

Judge Marrero found that the -- and I am quoting, the extraordinary trauma Mateo has already suffered during the time she served in custody, the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that has effectively enhanced to a disproportionate degree the level of punishment contemplated to the experience by inmates in the typical case during the period of incarceration prescribed by the guidelines for Mateo's offense.

Certainly, I think the same is true here.  There is no question that Mr. Pickett's deprivation of medical treatment while at MDC worked extraordinary trauma on him. Not just physical pain, but also fear that he would lose his leg or his life before he finished his sentence or in the early stages of his numerous complaints before he even saw a doctor.  That's not to mention the pain and suffering from the medical condition itself, pain at an excruciating level both before his tumor was diagnosed and even after and then

over the last year while he was still shackled and incarcerated at Carewell and other facilities, yet undergoing grueling chemotherapy, surgery, and postsurgical complications including wound infections after a long recovery.

I did note that two aspects of Dr. Venters' report that I wanted to note for the record, though the entire report is part of the record.

In particular, at page 7 of his report, he noted extensive delays Mr. Pickett faced in getting seen by MDC medical staff despite reporting a ten out of ten pain level and making repeated sick call complaints about his pain and his inability to walk.  Those were especially egregious after May 1st, in which there was a delay of 43 days between the first complaint and when he was finally seen on June 13th.

In addition, page 5, Dr. Venters notes that these delays in treatment and inadequate pain management included periods even after he was finally taken to the hospital and the tumor was found and biopsied.  He was placed back in general population and subjected to what Dr. Venters found was grossly inadequate management of his severe pain.

I've also considered Mr. Pickett's future medical needs.  In particular, the opinion of Dr. Iofin from Mount Sinai about the, quote, severe morbidity and mortality

risks, unquote, if he suffers a fall while in recovery including the potential need for amputation of his leg, as well as the risk of a cancer recurrence, and thus the importance of early detection.

Although conditions at MDC get a lot of attention in this courthouse. There continue to be severe nationwide staffing shortages at BOP facilities which adversely impact both the timeliness and level of care that persons incarcerated in those facilities receive, as then-BOP director Elizabeth Peters reported in congressional testimony she gave in October 2024. I will not go into detail, but I will note for the record three of the most recent reports from the Office of the Inspector General that relate to the continued gaps in staffing, the present health services unit and providing sufficient resources to the staff were employed there even in facilities designated for ones with particular serious or challenging medical conditions. Those include the FCI report about the Sheraton facility from May 2024, which noted that the health services department was staffed at just 67 percent, lacked a phlebotomist to draw blood for laboratory tests, and had acute shortages in particular among nurses.

OIG noted that these limitations were concerning for the treatment of any medical condition, but especially for those persons who suffered from chronic conditions.

Similarly at FCI Devens, also a specially designated medical facility, in December 2024, OIG issued a report that the facility's health services department was only staffed at 76 percent with 36 out of 149 positions unfilled.  Those vacancies were particularly acute in nursing with only ten of 42 nursing positions filled at the time of inspection.

For Mr. Pickett, there are clearly substantial risks.  There's the risk of falls and future injury.  The risk that he may not get his full and necessary course of physical therapy and thus retain the full use of his leg. And, of course, most seriously, the risk that a recurrence of his cancer will not be timely detected.

Let me underscore that I am not here deciding whether the medical care Mr. Pickett received or did not receive at MDC violated his constitutional right to be free from cruel and unusual punishment or any other standard of care as recognized in the medical literature and the caselaw governing prison medical services; nor am I making any factual finding as to whether, had Mr. Pickett received more timely and meaningful responses to his many sick call requests, he could have avoided having his leg partially replaced with a prosthesis through surgery or whether his course of chemotherapy would have been shorter and less grueling; nor have I considered whether any deficiencies in

medical care he received at MDC adversely impacted the risk of a recurrence or his life expectancy. I don't have a record on which to make those findings and it would not be appropriate for me to do so here.

However, Mr. Pickett, it's undisputed that what you went through personally over the last 16 months in terms of pain and suffering was horrific. And I don't think that anyone in this courtroom would dispute that in plain human terms. You should not have suffered that way. No one should have to endure months of excruciating leg pain that leaves them unable to move or leave their bed before seeing a doctor or being taken to a hospital for a biopsy. The sick call requests make your pain levels clear and also convey the understandable frustration you felt, but the facility was not responding to those complaints or even at some times aware of the fact that you had made identical complaints days earlier. They also convey the terror you felt that you might not survive the unknown cause of your pain since you did not then know whether it was an injury, an aneurysm, a tumor or something else. And it's undisputed that the surgery and treatment you received will leave you with a partially prosthetic leg, and, as a cancer survivor, someone with a condition that even in remission, you will have to monitor for the rest of your life.

I, having heard you sitting here today, I have no

reason to doubt that the nearly 24 months in MDC and the nine months in Carewell and other facilities that you served were indeed transformative for you. There are easier ways for one to go through such a transformation in one's life.

Physically, you are clearly transformed. I have seen you previously in other conversations. You now don't have any hair. You are confined to a wheelchair. But also personally, having heard your words and judged your demeanor today, I do credit your representation that this experience was life-changing and I am very glad, thanks in large part to the extensive and really commendable efforts of your legal team, the paralegals, the staff, the consultants, as well as those in Government who assisted in making sure that I was timely informed of everything you needed so that the Court could assess in getting you the care, even if belatedly. I am very glad that you are here today with us and will be eager to hear how things develop for the remainder of your time.

So with that said, for all of those reasons, it's my view that a sentence of time served combined with three years of supervised release is sufficient, but no greater than necessary, to comply with the purposes of Section 3553(a).

Let me now discuss some of the other terms and conditions.

Per Probation's recommendation, I will not order restitution. There is a mandatory special assessment of $100 for each count, which equates to a total of $300. In terms of forfeiture, on September 10, 2024, I entered an Order of Forfeiture regarding the seized firearms.

Am I correct that there is no additional action the Court needs to take at this time with respect to forfeiture?

MR. AMMARI: Just to pronounce it as part of the judgment as you have done, Your Honor.

THE COURT: So it is hereby pronounced as part of the judgment in the previous order as well.

I find that Mr. Pickett has no ability to pay a fine, so I will not impose one.

Are there any other special conditions of Probation that I have not previously noted -- not of Probation, but of supervised release?

THE PROBATION OFFICER: We do recommend the search condition.

THE COURT: I will impose the special search condition.

Ms. Wells, would you like me to read that into the record, or do you waive the reading?

MS. WELLS: I waive the reading.

THE COURT: The reading is waived.

Anything else from Probation?

THE PROBATION OFFICER:  No, Your Honor.

THE COURT:  Mr. Pickett, let me now advise you of your right to appeal.

You could appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there is some other fundamental defect in the proceedings that was not waived by your guilty plea.  Under some circumstances a defendant also has the right to appeal the sentence.  Any Notice of Appeal must be filed within 14 days of the filing of the entry of judgment, or within 14 days of the filing of a Notice of Appeal by the Government.  If requested, the Clerk will also prepare and file a Notice of Appeal on your behalf.  If you cannot afford to pay the cost of an appeal or for Appellate Counsel, you have the right to appeal for right to appeal in forma pauperis, which means you can apply to have the Court waive the filing fee.  On appeal, you may also apply for court-appointed counsel.

Is there anything else to address before we adjourn?

MR. AMMARI:  Two items, Your Honor.

One just to confirm on the record that the sentence imposed for each of the counts of time served will run concurrently.

THE COURT:  Yes, concurrently.

MR. AMMARI: And second, again, just to make sure the record is clear, with the exception of Your Honor's finding that the guideline for firearms -- the guideline enhancement for firearm does not apply, the rest of the PSR was expressly adopted.

THE COURT: Yes, except for what we identified was the error in the notation of the maximum sentence for the count addressed.

MR. AMMARI: Correct.

THE COURT: But the rest was adopted, yes.

Anything further from the defense?

MS. WELLS: Just one thing.

THE COURT: Sure.

MS. WELLS: So Mr. Pickett lives in North Carolina, so I would just ask that he be supervised in North Carolina while you retain the jurisdiction over the case.

THE COURT: Yes. This Court will retain jurisdiction. If at any point whoever is supervising in North Carolina thinks that a transfer of jurisdiction is appropriate for jurisdiction, I will entertain that, but for now I will retain jurisdiction, but I will authorize the supervision to be transferred to North Carolina.

MS. WELLS: Thank you.

THE COURT: Anything else further?

MR. AMMARI: No, Your Honor.

THE COURT: Mr. Pickett, I trust you probably do not ever want to be in this courtroom again. But let me personally wish you well and the best of luck to you and your family going forward. You certainly have no obligation to be in touch with me, but I am always happy to hear from you if there are any updates that you would like to share, but if I don't, please know that I wish you well and let me again commend your legal team for the excellent advocacy on your behalf in very difficult circumstances.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: We are adjourned.

(Matter adjourned.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Jamie Ann Stanton                    May 7, 2025

—————————————————————                —————————————————
JAMIE ANN STANTON                              DATE